IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE G. HYSON, | ) | CASE NO. 5:12CV1831 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, [1] | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff George G. Hyson ("Plaintiff" or "Hyson") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act), 42 U.S.C. §§ 416(i) and 423.  Doc. 1.  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties.  Doc. 15.  For the following reasons, the final

decision of the Commissioner is **AFFIRMED.**

### I.  Procedural History

Hyson filed an application for DIB on June 3, 2009, alleging a disability onset date of

September 9, 2007.[2]  Tr. 177-180.  He claimed that he was disabled due to left shoulder interior

dislocation, mood disorder, and post traumatic stress disorder.  Tr. 103-06; 109-15.  Hyson's

application was denied initially and on reconsideration.  Tr. 103-06; 109-15.  At Hyson's request,

on January 21, 2011, a hearing was held before Administrative Law Judge Hilton R. Miller (the

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] Hyson also filed (1) an application for DIB on July 24, 2006; (2) an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq*., dated July 24, 2006; (3) an application for DIB dated February 7, 2008; (4) an application for SSI dated September 23, 2008; and (5) an application for DIB dated September 23, 2008.  Tr. 151-176.  All of these applications were denied.  Tr. 71-102.  Although unclear from the record, it does not appear that Hyson ever appealed any of these denials.  The application for DIB that Hyson filed on June 3, 2009 is the only application before the Court on this appeal.

"ALJ").  Tr. 39-63.  On January 28, 2011, the ALJ issued a decision finding that Hyson was not

disabled.  Tr. 18-31.  Hyson requested review of the ALJ's decision by the Appeals Council on

February 8, 2011.  Tr. 14.  On June 22, 2012, the Appeals Council denied review, making the

ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Background

Hyson was born on October 7, 1962, and was 44 years old on his alleged onset date.  Tr.

30.  He graduated from high school (Tr. 229) and has past relevant work experience as a truck

driver and a laborer for a sanitation service.  Tr. 231.  He has his commercial driver's license.

Tr. 249, 398.  At the time of the hearing, Hyson lived in a house with his wife and child.  Tr.

318.

### B.    Medical Evidence

#### 1.    Physical Impairments

##### a.    Treatment History

Hyson has a history of left shoulder instability. He fell and dislocated his shoulder in

1982, 25 years before his alleged onset date, while in the Navy, and surgery was performed.  Tr.

258, 464.  Hyson stated that the pain has gotten worse progressively.  Tr. 258.  Hyson has sought

treatment at the Veteran's Affairs ("VA") Medical Center for his left shoulder injury and pain.

On November 27, 2007, Hyson saw Patrick Getty, M.D., at the VA Medical Center, for

an orthopedic consultation regarding his shoulder pain.  Tr. 405-06.  Hyson complained of

chronic pain in his left shoulder and instability.  Tr. 405.  He reported that "the last time his

shoulder popped out was approximately three months ago."  Tr. 405.  Upon examination, Hyson

had significant guarding.  Tr. 405.  X-rays obtained of the shoulder revealed mild glenohumeral

2

arthritis.  Tr. 406.  Dr. Getty assessed chronic left shoulder instability and mild glenohumeral arthritis.  Tr. 405.  Dr. Getty referred Hyson for a CT arthrogram.  Tr. 406.  Hyson told Dr. Getty that he was not interested in surgery and that he "refused to go to pain management."  Tr. 406. Instead, Hyson asked Dr. Getty to prescribe him medication that was stronger than OxyContin. Tr. 406.  Dr. Getty noted that he was "not quite sure whether or not [Hyson] ha[d] a problem which we can address satisfactorily or if he is just seeking medication at this point."  Tr. 406.

On March 4, 2008, Hyson saw Dr. C. Craig Ferris, his primary care physician at the VA Medical Center, for pain in his left shoulder.  Tr. 383.  Hyson stated that his pain was getting worse.  Tr. 384.  He reported that, even with his medications, his pain levels were currently a 9 out of 10 and that the pain was worse at night.  He also stated that his pain was, at best, 6 out of 10.  Tr. 383.  Dr. Ferris referred Hyson to a pain management clinic and renewed his prescription for Percocet and Tramadol.  Tr. 383.  Hyson saw Dr. Ferris for a follow-up appointment on May 12, 2008.  Tr. 597-602.  Dr. Ferris diagnosed internal derangement of the shoulder and renewed Hyson's medications.  Tr. 582.

On July 15, 2008, Hyson saw Amar B. Mutnal, a resident at the VA Medical Center, for his shoulder pain.  Tr. 592-93.  Dr. Mutnal noted that Hyson had not yet had a CT arthrogram performed on his left shoulder and that no further diagnosis could be made until he obtained the CT arthrogram.  Tr. 593.  On September 17, 2008, Hyson saw Dr. Ferris.  Tr. 578-82.  Dr. Ferris renewed Hyson's medications.  Tr. 582.

A CT arthrogram was taken of  Hyson's left shoulder on September 19, 2008.  1043-44. The CT arthrogram revealed a linear contrast extravasation into the rotator cuff, which suggested at least a high-grade partial-thickness rotator cuff tear.  Tr. 1043.  The scan also revealed significant glenohumeral osteoarthritis and postsurgical changes along the glenoid.  Tr. 1043-44.

An x-ray of Hyson's left shoulder was taken on January 16, 2009.  Tr. 718.  The x-ray showed "no acute findings" and "no significant degenerative changes."  Tr. 718.

On January 19, 2009, Hyson presented to John Makley, M.D., at the VA Medical Center – Orthopedic Surgery Clinic, for evaluation of his left shoulder.  Tr. 719-21.  Dr. Makley injected a local anesthetic into Hyson's glenohumeral joint in order to evaluate the shoulder.  Tr. 719.  On examination, Dr. Makley noted that Hyson did not have any atrophy posteriorly in his shoulder or throughout the rest of his shoulder laterally or anteriorly.  Tr. 719.  Dr. Markley noted Hyson was unable to bring his left shoulder past 80 degrees of abduction or 80 degrees of forward flexion. Tr. 719.  Because of the limited ability to truly assess Hyson's shoulder stability, Dr. Markley injected a local anesthetic into the glenohumeral joint of Hyson's left shoulder.  Tr. 720.  After the injection, Dr. Makley was able to bring Hyson's arm passively to 90 degrees of abduction and almost 50 degrees of external rotation.  Tr. 720.  He was also unable to dislocate the shoulder with some inferior pressure.  Tr. 720.  Dr. Makley stated that instability was not Hyson's primary issue.  Tr. 721.  He recommended further consultation and that Hyson "should re-engage in physical therapy and show some dedication to improving his own shoulder function and strength."  Tr. 721.

On February 10, 2009, Hyson had a follow-up appointment with Dr. Ferris.  Tr. 779-84.  Dr. Ferris noted tenderness in Hyson's left shoulder anteriorly.  Tr. 784.  Dr. Ferris recommended that Hyson follow up with the orthopedist for his shoulder pain.  Tr. 784.  He renewed Hyson's medications.  Tr. 785.

On February 19, 2009, Hyson attended a Compensation and Pension ("C&P") examination at the VA Medical Center, which was conducted by the VA to evaluate the level of compensation he should receive for injuries sustained while in the service.  Tr. 772-74.  The

review was performed by Patrick J. Hopperton, P.A.  Tr. 772-74.  The reviewer noted that Hyson did not use, or have need of, assistive devices and that he was able to complete activities of daily routine.  Tr. 773.  He also noted that there was no obvious muscle atrophy.  Tr. 773.  The reviewer concluded that Hyson's shoulder condition would have an impact on his ability to perform physical employment but would not impact his ability to perform sedentary employment.  Tr. 774.

On May 22, 2009, Hyson saw Ryan Garcia, a resident at the VA Medical Center – Orthopedic Surgery Clinic, for an evaluation of his left shoulder.  Tr. 748-49.  Dr. Garcia stated that he not think Hyson would ever again have a normal shoulder or be completely pain-free.  Tr. 748-49.  Dr. Garcia discussed surgical options for Hyson, with the ultimate goal of stabilizing his shoulder.  Tr. 748.  Dr. Garcia stated that, by increasing the stability, the pain in the shoulder might decrease.  Tr. 748.  However, Dr. Garcia stated that in no way would the surgery give him a pain-free, "fully rangeable shoulder."  Tr. 748.  Dr. Garcia also noted that tightening the shoulder might actually make his shoulder stiffer and lessen his range of motion; however it would be more stable and possibly less painful.  Tr. 748.

On August 4, 2009, Hyson finished a course of physical therapy after completing 20 sessions since February 2009.  Tr. 935.  The physical therapist noted that Hyson had seen some improvements with regard to his strength and stability but that pain in his shoulder remained continuous throughout the day.  Tr. 935.  The physical therapist stated that, even with additional sessions, Hyson's limitations would not improve any further.  Tr. 935.

Hyson saw Dr. Ferris for a follow-up appointment on September 14, 2009.  Tr. 960-65.  Hyson complained that he continued to have left shoulder pain, which was at a level of  8 out of 10 at the time of the appointment and could reach a 10 in cold weather.  Tr. 963.  Dr. Ferris

maintained Hyson's medications and noted that Hyson was going to follow up with the orthopedist to determine whether he wanted surgery on his left shoulder.  Tr. 964.  At a follow-up appointment with Dr. Ferris on February 3, 2010, Hyson again complained of left shoulder pain.  Tr. 980-85.  Dr. Ferris noted that surgery on the shoulder could only offer "frozen shoulder," which Hyson declined.  Tr. 984.  He also renewed Hyson's medications.  Tr. 984-85.

On September 23, 2010, another x-ray of Hyson's left shoulder was taken.  Tr. 1063.  The x-ray was compared to the x-ray from January 16, 2009, and showed a general cortical thickening of the coracoids process.  Tr. 1063.  It also revealed 2 small calcific densities just medial to the staple, which were noted as possibly loose bodies in a bursa.  Tr. 1063.  The x-ray also revealed degenerative change supralaterally at the humeral head.  Tr. 1063.

### b.    State Agency Reviewing Physicians

On April 7, 2008, state agency physician Rebecca Neiger, M.D., reviewed the record and completed a Physical Residual Functional Capacity assessment.  Tr. 554-61.  Dr. Neiger opined that Hyson could perform a light range of work (i.e., could lift and/or carry 20 pounds occasionally and 10 pounds frequently and could stand/walk or sit for 6 hours in an 8-hour workday).  Dr. Neiger also found that, due his left shoulder problem, Hyson was limited to only occasionally pushing/pulling, never climbing ladders/ropes/scaffolds, never crawling, no overhead reaching, and no hazards.  Tr. 555.

On March 12, 2009, Dr. Neiger re-evaluated Hyson's case and completed a second Physical RFC assessment.  Tr. 724-31.  She again confirmed that he could perform a range of light work with limited pushing, pulling, and overhead reaching.  Tr. 725.  Dr. Neiger limited Hyson to only occasional pushing and pulling in his left upper extremity and only occasional reaching above shoulder level on the left side.  Tr. 726.  She also limited him to never climbing

6

ladders/ropes/scaffolds and to avoiding all vibrations.  Tr. 727-28.

On August 7, 2009, a second state agency physician, Dimitri Teague, M.D., reviewed the record and completed a Physical RFC assessment.  Tr. 862-69.  He opined that Hyson retained the ability to perform a limited range of light work with only occasional push/pull in the left upper extremity due to an unstable left shoulder joint.  Tr. 860-61.  Dr. Teague also limited Hyson to never climbing ladders/ropes/scaffolds, occasionally crawling, no overhead reaching on the left side above the horizontal level, and no hazards.  861-63.

### 2.    Mental Impairments

#### a.    Treatment History

Hyson began treatment for his mental impairments at the VA Medical Center on July 27, 2007.  Tr. 1048.  On October 4, 2007, Hyson saw Ana Martinez, M.D., for evaluation of his depressive symptoms.  Tr. 416.  Hyson reported that he had trouble sleeping, which was mostly caused by pain in his shoulder.  Tr. 416.  Upon exam, Dr. Martinez noted that Hyson was neatly groomed, cooperative, and polite.  Tr. 417.  He had normal speech, cognition, and affect; good judgment and insight; and a logical and coherent thought process.  Tr. 417.  He reported no side effects from his medications.  Tr. 416.  Dr. Martinez diagnosed mood disorder due to general medical condition and assigned Hyson a Global Assessment of Functioning ("GAF") score of 45.[3]  Tr. 417.

On February 14, 2008, Hyson saw Dr. Martinez and reported decreased sleep and irritability due to pain and financial stressors.  Tr. 391-92.  He denied any side effects from his medication.  Tr. 391.  Although Hyson had an irritable mood on examination, he was

---

[3] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

cooperative, polite, had good eye contact, appropriate affect, and normal cognition. Tr. 392. He also had coherent, logical, and goal-directed thought processes, good insight, and good judgment. Tr. 392. Dr. Martinez again diagnosed mood disorder due to general medical condition and again assigned a GAF score of 45. Tr. 392.

Hyson attended a Compensation and Pension ("C&P") examination for mental disorders at the VA Medical Center on February 27, 2008. Tr. 387-91. The examination was completed by Josephine A. Ridley, a psychologist, who noted that Hyson smoked about 2.5 packs of cigarettes per day and denied ever drinking excessively. Tr. 388. Dr. Ridley also noted that Hyson's injury led him to taking highly addictive pain medications that were highly sedating and resulted in his having to quit work. Tr. 388. Hyson was diagnosed with adjustment disorder with depressed mood, chronic dysthymia, and personality disorder NOS, with avoidant features, and was assigned a GAF score of 45. Tr. 391. Dr. Ridley concluded that Hyson's depression was in response to the chronic stressors of chronic shoulder pain. Tr. 391.

Mental health treatment notes from February 2008 to June 2008 reflect that Hyson was "slightly depressed," oriented, alert, and had good to fair judgment. Tr. 569, 604-07, 616. At an appointment with Dr. Martinez on May 2, 2008, Hyson reported frustration with dealing with his son, who has Asperger Syndrome. Tr. 605. Dr. Martinez assigned a GAF score of 45. Tr. 605. At an appointment on July 29, 2008, Hyson informed Dr. Martinez that Wellbutrin gave him more energy but that he still had difficulty sleeping and with procrastination. Tr. 587. On examination, Hyson was again cooperative with normal cognition, appropriate affect, coherent thought process, and good judgment and insight. Tr. 588. Dr. Martinez maintained Hyson's GAF score at 45. Tr. 588. At an appointment with Dr. Martinez on November 18, 2008, Hyson reported that he was "ok" but that his anger was creeping back. Tr. 712. Dr. Martinez

maintained her diagnosis and GAF assessment.  Tr. 713.

On February 19, 2009, Hyson attended a C&P examination for mental disorders at the VA Medical Center.  Tr. 770-72.  The examination was performed by Alan S. Castro, M.D., a psychiatrist.  Tr. 770.  On examination, Dr. Castro noted that Hyson's mood was depressed but that he was cooperative and answered all questions appropriately. Tr. 771.  Hyson had no hallucinations, no paranoid delusions, fair insight and judgment, and a "fairly well organized" thought process.  Tr. 771.  Dr. Castro also reported that Hyson was oriented to all spheres and that he was able to follow the flow of the conversation quite well.   Tr. 771.  Dr. Castro diagnosed depression exacerbated by psychosocial stressors and chronic pain in Hyson's left shoulder, and assigned a GAF score of 42.  Tr. 771.  Dr. Castro concluded that Hyson's depression was impacting his social functioning but that his inability to work was mainly due to deficits in his range of motion in his arm.  Tr. 771.

Hyson saw Dr. Martinez on May 4, 2009, for a follow-up appointment.  Tr. 752.  Hyson stated that was still very angry and irritable.  Tr. 752.  He also reported that his energy level and motivation were both low.  Tr. 752.  On examination, Hyson was cooperative with normal cognition, appropriate affect, coherent thought process, and good judgment and insight.  Tr. 752-53.  Dr. Martinez maintained her diagnosis of mood disorder due to general medical condition and assigned a GAF score of 35.[4]  Tr. 752-53.

Hyson saw Dr. Martinez on June 22, 2009, and complained that he was still irritable and stressed.  Tr. 899.  He reported that counseling sessions helped his mood somewhat.  Tr. 899. On examination, Hyson's mood was dysphoric and angry but he was cooperative with normal

---

[4] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."

cognition, appropriate affect, coherent thought process, and good judgment and insight.  Tr. 899-900.  Dr. Martinez maintained her diagnosis and GAF assessment of 35.  Tr. 899-900.

At an appointment with Dr. Martinez on August 24, 2009, Hyson reported that he was still irritable and that he yells at everyone, including his pets.  Tr. 878.  He stated that he wants to be left alone.  Tr. 878.  On exam, Dr. Martinez noted that Hyson had a dysphoric and angry mood but that he was cooperative, polite, had good eye contact, appropriate affect, and normal cognition.  Tr. 878-79.  He also had coherent, logical, and goal-directed thought processes, good insight, and good judgment.  Tr. 878-79.  Dr. Martinez maintained her diagnosis and GAF assessment.  Tr. 878-79.

Hyson had a follow-up appointment with Dr. Martinez on October 15, 2009.  Tr. 912.  Hyson stated that he was not doing "good" because the weather was upsetting him and that he does not like winter.  Tr. 912.  Hyson's wife informed Dr. Martinez that Hyson was forgetting to do simple things.  Tr. 912.  On examination, although his mood was dysphoric and angry, he was cooperative, polite, had good eye contact, appropriate affect, and normal cognition.  Tr. 912-13.  He also had coherent, logical, and goal-directed thought processes, good insight, and good judgment.  Tr. 912-13. Dr. Martinez maintained her diagnosis and GAF assessment.  Tr. 912-13.

On November 30, 2009, Dr. Martinez completed a Mental Medical Assessment (Mental) form for Hyson.  Tr. 968-69.  Dr. Martinez opined that Hyson would be unable to perform the following tasks or functions on regular, reliable, and sustained schedules: carrying out detailed instructions; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychological based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and responding appropriately to changes in the work

10

setting.  Tr. 968-69.  She also opined that Hyson would have difficulty more than 20% of the time in the following areas of mental functioning:  understanding and remembering detailed instructions; maintaining attention and concentration for extended periods of time; working in coordination with or proximity to others without being distracted by them; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others.  Tr. 968-69.  Dr. Martinez did not provide any written explanation to support her conclusions.  Tr. 969.

On September 8, 2010, Hyson was referred to Mark A. Canna, Ph.D., a psychologist at the VA Medical Center, for evaluation of his depression.  Tr. 1048.  Hyson complained that his depression was probably related to his chronic shoulder pain.  Tr. 1048.  Upon reviewing Hyson's medical records regarding his depression and shoulder pain, Dr. Canna highlighted a notation in the file from Hyson's C & P examination of February 27, 2008, which stated that Hyson's "responses to questions about his substance use history have been inconsistent and possibly deceptive."  Tr. 1078.  Dr. Canna also noted that Hyson had tested positive for cannabinoids and had numerous phone requests for Oxycodone and Percocet.  Tr. 1078.  Dr. Canna further reported that Hyson "produced an uninterpretable profile" on the MMPI-2 "most likely due to symptom exaggeration."  Tr. 1048.  Dr. Canna found that Hyson's presentation "could be at least partially substance-induced" and recommended cognitive-behavioral treatment for anxious/depressive symptoms with an emphasis on relationship skills and social activity.  Tr. 1049.

On January 11, 2011, Jason Myers, a licensed independent social worker at the VA Medical Center who saw Hyson on several occasions, completed a Mental Medical Assessment

(Mental) form for Hyson.  Tr. 1066-67.  Mr. Myers checked the box that Hyson would not be able to perform the following tasks or functions on regular, reliable, and sustained schedules: carrying out detailed instructions; sustaining ordinary routine without special supervision; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychological based symptoms and performing at a  consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; traveling in unfamiliar places or using public transportation.  Tr. 1066-67.  Mr. Myers did not provide any substantive explanation or citation to medical evidence to support his conclusions.  Tr. 1066-67.

### b.       State Agency Reviewing Physicians

On April 5, 2008, state agency physician Mel Zwissler, Ph.D., reviewed the record and completed a Mental RFC Assessment and a Psychiatric Review Technique Form ("PRTF").  Tr. 535-52.  Dr. Zwissler opined that Hyson did not have marked limitations in any area.  Tr. 549-50.  He opined that Hyson was not significantly limited in his ability to: remember work-like procedures; understand, remember and carry out short and simple instructions; perform activities within a schedule, sustain an ordinary routine without special supervision; work in coordination to others without being distracted; make simple work-related decisions; complete a normal work week; interact appropriately with the general public; ask simple questions and request assistance; get along with others; maintain socially appropriate behavior; be aware of normal hazards; travel; and set realistic goals.  Tr. 549-50.  Dr. Zwissler also found that Hyson had moderate

12

limitations in the following areas: carrying out detailed instructions; maintaining attention and concentration for extended periods; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting.  Tr. 549-50.  On the PRTF, Dr. Zwissler found that Hyson had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  Tr. 545.  He opined that Hyson could perform simple and moderately complex tasks that are routine and with limited superficial contact with others despite his impairments.  Tr. 551.

On December 3, 2008, state agency physician Patricia Semmelman, Ph.D., reviewed the record and completed a Mental RFC Assessment and PRTF.  Tr. 690-707.  She opined that there was either no evidence of limitation or that Hyson was not significantly limited in 14 out of 20 areas of functioning.  Tr. 704-05.  She found moderate limitations in the following categories: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal work day and work week without interruptions from psychologically based symptoms and  performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and responding appropriately to changes in the work setting.  Tr. 704-05.  On the PRTF, Dr. Semmelman found that Hyson had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  Tr. 700.  Dr. Semmelman opined that, despite his limitations, Hyson could perform work with the following restrictions: "He can interact occasionally and superficially and receive instructions and ask questions appropriately in a smaller or more solitary and less public

to nonpublic work setting. He can cope with the ordinary and routine changes in a work setting that is not fast paced or of high demand." Tr. 706.

On July 20, 2009, a third state agency physician, Tasneem Khan, Ed.D., reviewed the record and completed a Mental RFC Assessment and PRTF. Tr. 841-58. He opined that Hyson was not significantly limited in 11 out of 20 areas of functioning. Tr. 855-56. He found moderate limitations in the following categories: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal work day and work week without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others. Tr. 855-56. On the PRTF, Dr. Khan found that Hyson had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Tr. 851. He opined that Hyson could "comprehend, remember, and carry out simple to moderately complex tasks" despite his impairments. Tr. 857. He also opined that Hyson could adapt to a setting in which duties are routine and predictable. Tr. 857. Dr. Khan also stated that Dr. Martinez's assessed GAF scores of 35-45 were inconsistent with Hyson's benign mental status examination and daily activities. Tr. 857.

### C.    Third Party Functional Report

On June 19, 2009, Hyson's wife, Denise M. Hyson, completed a functional report for Plaintiff. Tr. 319-24. Ms. Hyson stated that Plaintiff helped take care of the family pets by feeding them and by sometimes taking the pets out. Tr. 320. She also stated that Plaintiff mowed the lawn, cleaned the house, and did laundry. Tr. 321. Ms. Hyson further explained that Plaintiff went shopping for food once per week. Tr. 322. She stated that Plaintiff watched television "all of the time." Tr. 322. Ms. Hyson stated that Plaintiff could walk for 2.5 miles before he would need to stop and take a break. Tr. 323. She explained that Plaintiff could not pay attention for too long, could not follow written or spoken instructions very well, and could get along with an authority figure "ok." Tr. 323-24. She stated that Plaintiff did not handle stress "very well at all" and that he did not do well with changes in his routine. Tr. 324.

### D.    Administrative Hearing

#### 1.    Hyson's Testimony

On January 21, 2011, Hyson appeared with counsel and testified at the administrative hearing before the ALJ. Tr. 41-57. Hyson explained that his severe impairments were left shoulder instability, depression, and carpal tunnel syndrome in his right wrist. Tr. 45-46. Hyson stated that he has trouble gripping and holding and does not know if he is going to drop things that he is holding. Tr. 51. He testified that he could lift a gallon of milk with his right hand but would not attempt to lift even a gallon of milk with his left hand. Tr. 51. He also testified he could not do household activities such as cleaning the house, mowing the lawn, and doing laundry. Tr. 52. Hyson stated that he even needs help getting dressed because he has trouble with small buttons. Tr. 52. He testified that he only leaves the house for doctor's appointments because he does not like to drive. Tr. 53. He explained that he has a commercial driver's license

and that he maintains his driver's license in the hope that one day he might be able to drive again. Tr. 56.  Hyson explained that he could stand up and walk without assistance but would not be able to do so for long. Tr. 55.  He also testified that he suffers from anger issues stemming from depression and fatigue from being unable to sleep and that he has problems with confusion and concentration as side effects from his medications. Tr. 55.

### 2.     Vocational Expert's Testimony

Lynne Smith (the "VE") appeared at the hearing and testified as a vocational expert.  Tr. 58-61.  She stated that Hyson had previously worked as a garbage truck driver (semi-skilled position at the medium exertional level), as well as a dump truck driver (unskilled position at the medium exertional level but performed at the heavy exertional level).  Tr. 58-59.  The ALJ asked the VE whether a hypothetical individual with Hyson's vocational characteristics and the following limitations could perform Hyson's past work or any other work in the national economy:

> [C]apacity to lift and/or carry 20 pounds occasionally, 10 pounds frequently, stand, sit and/or walk for a total of about six hours in an eight-hour workday. Avoid work that involves ladders, ropes, scaffolds, and only occasional crawling. No overhead reaching using the left, upper extremity above the horizontal level, that avoids exposure to hazards such as machinery, unprotected heights, scaffolds, and concentrated exposure to vibrations, that does not involve frequent fine manipulation using the hands, and is also simple, repetitive, and routine insofar as SVP1 and 2 jobs are considered, that entails minimal interaction.

Tr. 59.  The VE testified that the hypothetical individual could not perform Hyson's past relevant work but could perform other jobs that existed in significant numbers in the national economy, including cleaner of offices (890,000 jobs nationally, 28,000 jobs in Ohio, and 2,400 jobs locally); mail clerk (150,000 jobs nationally, 6,000 jobs in Ohio, and 1,200 jobs locally); and cafeteria attendant (390,000 jobs nationally, 16,000 jobs in Ohio, and 1,500 jobs locally).  Tr. 60. In a second hypothetical, the ALJ asked the VE to consider the same limitations as in the first

16

hypothetical but with added limitations consistent with the testimony from Hyson during the hearing.  Tr. 60.  The VE said that there would be no jobs that exist for such a person.  Tr. 60. The VE testified that this response was based on Hyson's testimony that he could only stand for about five minutes.  The VE also stated that if a person only had occasional use of both upper extremities, it would eliminate sedentary and light unskilled jobs.  Tr. 60-61.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).   In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

claimant's impairment prevents him from doing past relevant work.   If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

The ALJ found that Hyson met the insured status requirements of the Act through December 31, 2012.  Tr. 20.  At Step One of the sequential analysis, the ALJ determined that Hyson had not engaged in substantial gainful activity since September 14, 2007, his alleged onset date.  Tr. 20.  At Step Two, the ALJ found that Hyson had the following severe impairments: left shoulder instability, carpal tunnel syndrome, and affective disorder.  Tr. 20.  At Step Three, the ALJ found that Hyson did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[5]  Tr. 20-22.  The ALJ then determined Hyson's RFC and found that he could perform light work with the following limitations:

---

[5]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

> [C]an occasionally crawl, but cannot climb ladders, ropes or scaffolds; cannot reach overhead beyond the horizontal level with the left upper extremity; must avoid exposure to hazards such as machinery, unprotected heights and scaffolds; must avoid concentrated exposure to vibrations; cannot engage in frequent fine manipulation with his hands; and is limited to jobs with simple, routine, repetitive tasks and minimal interactions.

Tr. 22-30.  At Step Four, the ALJ found that Hyson was unable to perform any past relevant work.  Tr. 30.  At Step Five, after considering Hyson's vocational factors, RFC, and the testimony of the VE, the ALJ found that Hyson was capable of performing other jobs that existed in significant numbers in the national economy.  Tr. 30-31.  The ALJ thus concluded that Hyson was not disabled. Tr. 31.

## V.  Arguments of the Parties

Hyson challenges the Commissioner's decision on three grounds.  First, he asserts that the ALJ did not properly evaluate the opinions of his treating sources.  Second, he contends that the ALJ failed to properly assess his credibility and failed to properly evaluate the third party statement from his wife.  Third, Hyson argues that the ALJ erred at Step Five of the sequential analysis because he relied on testimony from the VE that was in response to an incomplete hypothetical.

In reply, the Commissioner argues that the ALJ properly evaluated the medical source opinions.  The Commissioner also asserts that the ALJ properly assessed Hyson's credibility and the statement from Hyson's wife.  The Commissioner further argues that the ALJ did not error at Step Five because his hypothetical to the VE accounted for all of the limitations that the ALJ found valid and credible and that the ALJ reasonably relied on the testimony of the VE to find that Hyson could perform some work.

## VI.  Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.

2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the

evidence supports a claimant's position, a reviewing court cannot overturn "so long as

substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc.

Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

### B.      The ALJ Properly Evaluated the Medical Source Opinions

Under the treating physician rule, the opinion of a treating source is entitled to controlling

weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory

diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case

record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§

404.1527(d)(2), 416.927(d)(2).  If the opinion of a treating source is not accorded controlling

weight, an ALJ must consider certain factors in determining what weight to give the opinion,

such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. However, the ALJ is not obliged to set forth a detailed analysis with respect to each and every one of the factors listed above. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

Hyson contends that the ALJ erroneously evaluated the opinion of Dr. Martinez under the treating physician rule. Hyson also asserts that the ALJ did not provide appropriate weight to the assessment completed by his social worker, Mr. Myers.[6] Doc. Doc. 18, p. 16. Each argument will be addressed in turn.

1.     **Dr. Martinez**

As discussed above, on November 16, 2011, Dr. Martinez completed a medical source statement and opined that Hyson would not be able to perform the following tasks or functions on regular, reliable, and sustained schedules: carrying out detailed instructions; making simple

---

[6] In his principal brief on the merits, Hyson argues that the ALJ also improperly evaluated the opinion of Dr. Antonio Montinola. Doc. 18, p. 18. However, as noted by the Commissioner, it appears that this opinion was inadvertently included in the record for this case. Tr. 1069-70. It is undisputed that Dr. Montinola never treated Hyson and never rendered an opinion with regard to Hyson ; the opinion contained in the record is for a different patient. Doc. 19, p. 12. In his reply brief, Hyson acknowledges that Dr. Montinola's opinion was for a different claimant and should not be considered in this case. Doc. 20, p. 1.

work-related decisions; completing a normal work day and work week without interruptions from psychological based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and responding appropriately to changes in the work setting.  Tr. 968-69.  She also opined that Hyson would have difficulty more than 20% of the time in the following areas of mental functioning:  understanding and remembering detailed instructions; maintaining attention and concentration for extended periods of time; working in coordination with or proximity to others without being distracted by them; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others.  Tr. 968-69.  Dr. Martinez did not provide any written explanation to support her conclusions.  Tr. 969.

The ALJ evaluated Dr. Martinez's opinion, as well as the record as a whole, and reasonably assigned less than full weight to her opinion.  The ALJ explained that he gave less than controlling weight to Dr. Martinez's opinion because it was unsupported and inconsistent with the medical evidence of record.  Tr. 27.  The ALJ also noted that Dr. Martinez likely relied upon Hyson's subjective complaints when rendering her opinion rather than on the objective medical evidence.  Tr. 27.  The ALJ's explanation demonstrates that he properly considered the regulatory factors and discounted Dr. Martinez's opinion based on the supportability of the opinion and the consistency of the opinion with the record as a whole.  The ALJ therefore stated good reasons for assigning less than controlling weight to Dr. Martinez's opinion and fulfilled his obligations under the regulations.  *See, e.g., Allen*, 561 F.3d at 651 (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason was brief but reached several of the factors an ALJ must consider when determining what weight

to give non-controlling opinion); *Bledsoe v. Barnhart*, 2006 WL 229795, at *4 (6th Cir. 2006)
("The ALJ reasoned that Dr. Lin's conclusions are 'not well supported by the overall evidence of
record and are inconsistent with other medical evidence of record.' This is a specific reason for
not affording controlling weight to Dr. Lin.").

The reasons provided by the ALJ for discounting Dr. Martinez's opinion are supported by
substantial evidence.  First, Dr. Martinez failed to provide any explanation in support of her
opinions.  The form that Dr. Martinez completed for Hyson was a checklist-type form, which
contained numerous boxes that the evaluator could check and also space at the end of the form
where the evaluator could provide a substantive basis for the opinions.  Dr. Martinez merely
checked the boxes on the form but left blank the section of the form where she was to provide
her written explanation for her conclusions.  Tr. 968-69.  Dr. Martinez failed to provide any
substantive basis for her conclusions.  An ALJ is not required to accept an opinion from a
treating physician that is conclusory and unsupported.  *See Anderson v. Comm'r Soc. Sec.*, 195
Fed. Appx. 366, 370 (6th Cir. 2006) ("The ALJ concluded, properly in our view, that the
[treating physician's] treatment notes did not support and were inconsistent with his conclusory
assertion that appellant was disabled."); *see also Kidd v. Comm'r of Soc. Sec.*, 283 Fed. Appx.
336, 340 (6th Cir. 2008) (citing *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th
Cir. 1994)) (holding that an ALJ need not credit a treating physician's conclusory opinions that
are inconsistent with other evidence).  Because Dr. Martinez failed to provide an explanation of
her conclusions or identify any objective medical evidence to support her opinions, the ALJ did
not err in discounting her opinion.  *Price v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 172, 176 (6th
Cir. 2009) ("Because Dr. Ashbaugh failed to identify objective medical findings to support his
opinion [on a questionnaire] regarding Price's impairments, the ALJ did not err in discounting

his opinion."). *See also Smith v. Astrue*, 359 Fed. Appx. 313, 316 (3d Cir. 2009) ("[C]hecklist forms . . ., which require only that the completing physician 'check a box or fill in a blank,' rather than provide a substantive basis for the conclusions stated, are considered 'weak evidence at best' in the context of a disability analysis."); *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[T]he ALJ may permissibly reject check-off reports that do not contain any explanation of the bases of their conclusions.").

Further, the severe limitations found by Dr. Martinez are inconsistent with her own treatment notes and other evidence in the record.  As a preliminary matter, Hyson was diagnosed with depression secondary to pain.  Tr. 391.  However, no physician placed significant physical restrictions on Hyson due to his shoulder.  In addition, the evidence shows that, as his treatment progressed, Hyson's symptoms stabilized and ultimately improved.  Treatment notes show that Hyson was future-oriented and motivated to provide for his family and that his energy level had improved.  Tr. 710.  Dr. Martinez routinely noted that Hyson was cooperative and polite; had no increased or decreased psychomotor activity; was alert and oriented; his affect was appropriate and adequate; his thought process was coherent, logical, and goal directed; and that his insight and judgment were good.  Tr. 392, 923, 975, 990, 1007, 1014, 1028, 1035, 1055, 1073, 1085, 1167.  Hyson did not report hallucinations, delusions, suicidal ideations, or homicidal ideations. Tr. 386, 389, 392, 415, 913.  And, although Hyson reported that he still had sleep disturbances, he stated that his sleep had improved.  Tr. 924.  Hyson also expressed a desire and motivation to change.  Tr. 930.  Moreover, Dr. Canna, a second psychologist at the VA Medical Center who evaluated Hyson for his depression, noted that Hyson "most likely" exaggerated his symptoms and that his depression "could be at least partially substance-induced."  Tr. 1048-1049.  This evidence does not support the severe functional limitations found by Dr. Martinez.

In addition, all three state agency physicians who reviewed the record in this case with regard to Hyson's mental impairments opined that his mental impairments did not rise to a disabling level.  Agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues.  *See* 20 C.F.R. § 416.927.  Dr. Zwissler opined that, despite his mental impairments, Hyson could perform simple and moderately complex tasks that are routine and with limited superficial contact with others.  Tr. 551.  Similarly, Dr. Semmelman opined that Hyson could perform work with the following restrictions: "He can interact occasionally and superficially and receive instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting.  He can cope with the ordinary and routine changes in a work setting that is not fast paced or of high demand."  Tr. 706.  And, Dr. Khan opined that Hyson could "comprehend, remember, and carry out simple to moderately complex tasks" despite his impairments.  Tr. 857.  She also opined that Hyson could adapt to a setting in which duties are routine and predictable.  Tr. 857.

Finally, as noted by the ALJ, there is evidence in the record that Hyson was able to perform a wide range of daily activities.  Tr. 19.  In written statements Hyson provided to the SSA, he stated that he cared for his pets with the help of his wife and performed household chores such as cleaning, washing clothes, and mowing the lawn.  Tr. 308-09.  He also indicated that he prepared meals for both himself and his son on a daily basis and that he shopped once a week for approximately two hours at a time.  Tr. 309.

All of this evidence supports the ALJ's determination that Hyson could perform simple, unskilled work with only minimal social interaction.  Hyson, however, cites to other evidence in the record and argues that it shows that his mental impairments were more severe than found by the ALJ.  Doc. 18, p.19-20; Doc. 20, pp. 5-8.  Even if there is evidence to support Hyson's

position, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted).  "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id*. at 773 (citations omitted).  In this case, the ALJ reviewed the entire record, weighed the evidence, and concluded that Hyson retained the ability to perform some work.  Even assuming there is evidence in the record that supports Hyson's claim that he was more limited than found by the ALJ, substantial evidence also supports the ALJ's conclusion.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ," the Commissioner's decision cannot be overturned).  Based on the applicable standard of review set forth above, the ALJ's decision is therefore affirmed.

Hyson also accuses the ALJ of improperly "playing doctor" with regard to his conclusion that Hyson could perform some work.  Doc. 18, p. 20.  This argument is without merit.  In weighing the medical evidence, "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Simpson v. Comm'r of Soc. Sec.*, No. 08–3651, 2009 U.S.App. LEXIS 19206, at *36–37, 2009 WL 2628355 (6th Cir. Aug. 27, 2009). Accordingly, "an ALJ may not substitute his [or her] own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence." *Id*. (internal quotations omitted); *see also Bledsoe v. Comm'r of Soc. Sec*., No. 1:09cv564, 2011 U.S. Dist. LEXIS 11925, at *7, 2011 WL 549861 (S.D. Ohio Feb. 8, 2011) ("An ALJ is not permitted to substitute her own medical judgment for that of a treating physician and may not make her own independent medical findings"). "While an ALJ is free to resolve

26

issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, the ALJ cannot substitute his [or her] own lay 'medical' opinion for that of a treating or examining doctor." *Beck v. Comm'r of Soc. Sec.*, No. 1:10–cv–398, 2011 U.S. Dist. LEXIS 90029, at *14, 2011 WL 3584468 (S.D. Ohio June 9, 2011).

Contrary to Hyson's assertion, the ALJ weighed the evidence of record and reasonably concluded that Dr. Martinez's unsupported checkbox assessment was inconsistent with both her own treatment notes and other evidence of record, including the opinions of three state agency reviewing physicians who all opined that Hyson could perform some work. The ALJ did not substitute his judgment for that of a treating physician, but rather weighed the medical evidence and reasonably determined that Hyson could perform some work. Thus, the ALJ did not improperly "play doctor" in this case by assigning less than controlling weight to the opinion of Dr. Martinez.

### 2.    Mr. Myers

Mr. Myers, a social worker for the VA Medical Center who saw Hyson on several occasions, also completed a checklist-type assessment for Hyson and opined that Hyson would not be able to perform numerous tasks or functions on regular, reliable, and sustained schedules because of his mental impairments. Tr. 1066-67. Hyson contends that the ALJ erred in failing to give controlling weight to Mr. Myers' assessment. Doc. 14, p. 3. This argument is also without merit.

First, the ALJ was not obliged to accept Mr. Myers' opinion. A social worker is not an accepted medical source whose opinion must be given controlling weight. 20 C.F.R. § 416.913(a) 20 C.F.R. § 404.1527. Instead, a social worker is considered a non-listed medical source whose opinion may, but is not required to, be used to show the severity of a claimant's

27

impairments.  20 C.F.R. § 416.913(d)(1).  As set forth in Social Security Ruling ("SSR") 06–03p, 2006 WL 2329939, opinions from non-medical sources that have seen a claimant in their professional capacity should be evaluated by using the applicable factors set forth in 20 C.F.R. § 404.1527(d)(2), including the specialization of the source, the supportability of the opinion, and how consistent the opinion is with other evidence.  20 C.F.R. §§ 404.1527(d)(2).

Second, similar to the assessment completed by Dr. Martinez, Mr. Myers did not provide any substantive basis for his conclusions.  Mr. Myers simply checked off the boxes on the form but did not provide any written explanation or cite to any medical evidence to support his conclusions.  Tr. 1066-67.  As such, the ALJ did not error by failing to give significant deference to Mr. Myers' opinion.  *See Price,* 342 Fed. Appx. at 176.

Third, the ALJ properly evaluated Mr. Myers' opinion and reasonably assigned it less than full weight.  Tr. 27-28.  The ALJ explained that he gave less than full weight to Mr. Myers' opinion because, as a social worker, he was not medically trained to render an opinion regarding the limiting effects of Hyson's mental impairments.  Tr. 28.  The ALJ also found that Mr. Myers' opinion was inconsistent with the medical evidence of record.  The ALJ's explanation, although brief, demonstrates that he properly considered the regulatory factors and discounted Mr. Myers' opinion based the specialization of the source, the supportability of the opinion, and the consistency of the opinion with the record as a whole.  The ALJ therefore stated good reasons for assigning less than controlling weight to Mr. Myers opinion and fulfilled his obligations under the regulations and SSA rules.  And, as discussed above, there is substantial evidence in the record to support the ALJ's conclusion that, despite his mental impairments, Hyson could perform simple, unskilled work with only minimal social interaction.  Accordingly, under the applicable standard of review, the ALJ's decision must be affirmed.

## C.  Substantial Evidence Supports the ALJ's Credibility Finding

Hyson next argues that the ALJ erred in finding that his testimony regarding his impairments was not fully credible.  Doc. 14, pp. 10-12.  Hyson contends that the reasons given by the ALJ were insufficient to reject his testimony and his subjective complaints of debilitating pain.  Upon review, the undersigned concludes that the ALJ properly evaluated the entire record and reasonably concluded that Hyson's subjective complaints were not fully credible.

A disability claim can be supported by a claimant's subjective complaints as long as there is objective medical evidence of the underlying medical condition in the record.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 475. "[I]f disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken." *Id*. (citing 20 C.F.R. § 404.1529(c)(3)). To evaluate the credibility of a claimant's subjective reports of pain, a two-part analysis is used. 20 C.F.R. § 416.929(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.  *Rogers*, 486 F.3d at 247.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work.  *Id.*  The ALJ should consider the following factors in evaluating a claimant's symptoms:

1) the individual's daily activities;
2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
3) factors that precipitate and aggravate the symptoms;
4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes

29

every hour, or sleeping on a board); and

7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *3.

However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476 (citations omitted).  An ALJ's credibility assessment must be supported by substantial evidence but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  It is the province of the ALJ, not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  *Rogers*, 486 F.3d at 247.  If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state his reasons so as to make clear to the claimant and to any subsequent reviewers the weight given to the claimant's statements and the reason for that weight.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *2.

In this case, the ALJ considered the record as a whole and found that Hyson experienced pain from his impairments but concluded that the pain was not disabling.  In particular, the ALJ expressly credited Hyson's complaints of pain by finding that he could no longer perform the medium to heavy exertional demands of his past work as a truck driver and laborer and was instead limited to a reduced range of light work.[7]  Tr. 30.  *See Simmonds v. Heckler*, 807 F.2d 54,

---

[7]  The ALJ accounted for Hyson's left shoulder impairment by imposing certain postural limitations, restrictions on climbing and crawling, and restrictions on exposure to hazards.  Tr. 22.  To account for Hyson's carpal tunnel syndrome, the ALJ included a restriction that Hyson could not engage in frequent fine manipulation with his hands.  Tr. 22.  And, to account for Hyson's affective disorder, the ALJ limited him to performing only jobs with simple,

58 (3d Cir. 1986) (holding that an ALJ's finding that a claimant can do work only at an exertional level significantly lower than in the past constitutes an implicit acceptance of a claimant's subjective complaints).  However, the ALJ reasonably concluded that Hyson's allegations regarding the nature and persistence of his symptoms were not fully credible.

In reaching this determination, the ALJ undertook the appropriate two-part analysis described above for evaluating the credibility of a claimant.  Tr. 28-30.  The ALJ provided several reasons for discounting Hyson's credibility, including contradictions between Hyson's testimony and the medical evidence, the fact that he responded well to conservative treatments and medications, and his activities of daily living.  Tr. 28-29.  *See Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."); *see also* SSR 96-7p, 1996 WL 374186, at *3 (credibility analysis should include consideration of, among other things, the objective medical record, the claimant's daily activities, the effectiveness of medication, and treatment received).  This determination is entitled to "great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters*, 127 F.3d at 531.

A review of the record reveals that the ALJ's credibility determination is supported by substantial evidence.  As discussed above, no physician imposed significant physical limitations due to Hyson's shoulder impairment.  In fact, a report from an examination at the VA Medical Center found that Hyson's shoulder would not impact his ability to perform sedentary work activities.  Tr. 774.  More significantly, in a progress note, Dr. Martinez herself noted that Hyson "seem[ed] to be exag[g]erating his symptoms and demeanor."  Tr. 421.  Furthermore, Dr. Canna, who evaluated Hyson's depression, found that he "produced an uninterpretable profile" on the

---

routine, repetitive tasks and minimal interactions. Tr. 22.

MMPI-2, "most likely due to symptom exaggeration." Tr. 1048. All of this evidence supports the ALJ's finding that Hyson was not fully credible.

Hyson's credibility was further undermined by his inconsistent statements. Tr. 21. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p, 1996 WL 374186, at *5. Contrary to his testimony at the hearing that he did not use illegal drugs (Tr. 49-50), the evidence of record confirmed that Hyson tested positive for marijuana use. *See Doepke v. Comm'r of Soc. Sec.*, 2010 WL 3119905 at *10 (M.D. Fla. 2010) (recognizing that an ALJ can consider a claimant's substance abuse as evidence regarding the credibility of his subjective complaints). In addition, contrary to Hyson's reports of concentration difficulties (Tr. 54), Hyson and his wife both stated that Hyson watched television "every day, all day" and "all the time." Tr. 310, 322. And, contrary to his testimony that he was unable to perform any housework or chores, Hyson stated in reports to the SSA that he mowed his lawn, cleaned, and washed laundry. Tr. 309, 320. Medical treatment notes also describe Hyson as "quite active," "actively daily playing with his pet wolves for several hours/day," and that he "runs with five wolves twice a day" for exercise. Tr. 1127, 1135, 1170. These inconsistencies undermine Hyson's credibility. The ALJ's credibility determination is therefore supported by substantial evidence and entitled to deference.

Hyson also argues that the ALJ failed to articulate a valid reason for discrediting the statements made by his wife in the third party functional report that she completed for Hyson. Doc. 18, pp. 21-22. This argument is unpersuasive. The testimony of a lay witness "must be given 'perceptible weight' [only] where it is supported by medical evidence." *Allison v. SSA*, No. 96–3261, 1997 WL 103369, at *3 (6th Cir. 1997) (citing *Lashley v. HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) ("Perceptible weight must be given to lay testimony where ... it is fully supported

by the reports of the treating physicians.").  While the testimony and statements of lay witnesses must be considered, an ALJ does not have to discuss every piece of evidence presented as long as the record is developed fully and fairly.  *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir.1993); *cf. Higgs v. Bowen*, 880 F.2d 860, 864 (6th Cir.1988) (holding that the Appeals Council did not err by failing to "spell out" in its opinion the weight it attached to lay witness testimony where the Council's opinion stated that it "considered the entire record which was before the administrative law judge, including the testimony at the hearing").  Further, pursuant to SSR 06–03p, 2006 SSR LEXIS 5 (Aug. 9, 2006), an ALJ must "consider all relevant evidence in the case record," which includes opinion evidence from "other sources."  However, SSR 06-03p does not include "an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'"  *Chambers v. Astrue*, 835 F.Supp.2d 668, 678 (S.D. Ind. 2011).

In this case, the ALJ discussed the statements from Ms. Hyson and explained that he assigned less than full weight to her statements because she was not medically trained to make exacting observations as to frequencies, types, and degrees of medical signs and symptoms. Doc. 28.  The ALJ also reasonably considered that Ms. Hyson was not a disinterested third party witness as she had a financial interest in Plaintiff receiving disability income. *See Ford v. Barnhart*, 57 Fed. Appx. 984, 988-89 (3d Cir. 2003) (finding that the ALJ properly rejected testimony of claimant's wife, who retained custody of their minor child, because she retained a financial interest in the claimant receiving disability income).  As such, the ALJ stated good reasons for assigning less than full weight to the Ms. Hyson's statements.

Substantial evidence supports this determination.  The majority of Ms. Hyson's statements were, in fact, inconsistent with Hyson's testimony regarding his limitations.  Ms.

33

Hyson stated that Hyson helped take care of the family pets by feeding them and by sometimes taking the pets out.  Tr. 320.  She stated that Hyson mowed the lawn, cleaned the house, and did laundry.  Tr. 321.  Ms. Hyson also explained that Hyson went shopping for food once per week and that he watched television "all of the time."  Tr. 322.  These statements directly contradict Hyson's testimony.  Further, to the extent that Ms. Hyson's statements regarding her husband's ability to pay attention, follow instructions, handle stress, and get along with others are duplicative of Hyson's testimony, the ALJ was not required to specifically address such assertions.  An ALJ is not obligated to make credibility findings for duplicative lay witness testimony.  *See Davis v. Astrue*, 237 Fed. Appx. 339 at *3 (10th Cir. 2007) (stating that an ALJ is not required to make specific findings for cumulative witness "testimony"); *Crosby v. Barnhart*, 2004 WL 1096413 (3d Cir. May 12, 2004) (stating that an ALJ's failure to address the claimant's fiancé's affidavit detailing claimant's daily physical limitations was harmless since the fiancé's description was cumulative). *Cox v. Commissioner of Soc. Sec*., 132 F.3d 30 at *1 (1st Cir. 1997) (finding no prejudice from an ALJ's failure to separately assess the credibility of an affidavit of the claimant's wife).  In sum, the ALJ stated good reasons for assigning less than full weight to the assertions of Ms. Hyson.  This determination is supported by substantial evidence and is entitled to deference.

**D.      The ALJ Did Not Err at Step Five of the Sequential Analysis**

In his last argument, Hyson asserts that the ALJ erred at Step Five because he relied on testimony of the VE that was in response to an incomplete hypothetical.  Doc. 18, pp. 23-24.  This argument is also lacking in merit.

Once it has been determined that a claimant cannot perform his past relevant work, the burden shifts to the Commissioner at Step Five to show that there are other jobs that exist in

significant numbers in the economy that the claimant can perform, consistent with his or her RFC and vocational factors of age, education and work experience. *Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).  In reaching his Step Five determination,  the ALJ may rely on the testimony of a vocational expert as long as it is in response to a hypothetical that accurately reflects the claimant's physical and mental limitations. *Varley v. Sec'y of Health & Human Servs*., 820 F.2d 777, 779 (6th Cir. 1987).  In formulating the hypothetical, the ALJ only needs to incorporate those limitations he accepts as credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, the ALJ asked the VE a hypothetical that incorporated the RFC he found for Hyson.  Based on the hypothetical, the VE stated that a person with Hyson's personal and vocational characteristics and RFC could perform work as a cleaner of offices, mail clerk, and cafeteria attendant.   Hyson argues that the ALJ instead should have relied on the answers to the hypothetical questions posed by his counsel, which were based on limitations set forth by Dr. Martinez and Mr. Myers.  This argument merely restates Hyson's earlier arguments, considered and rejected above, that the ALJ erred by rejecting the opinions of Dr. Martinez and Mr. Myers. Moreover, the ALJ was not required to include limitations in the hypothetical that he determined were unsupported by the evidence or not credible. *See Casey*, 987 F.2d at 1235.  Therefore, the ALJ did not err, and the VE's testimony -- given in response to a hypothetical that reasonably reflected all the limitations that the ALJ found valid and credible -- constituted substantial evidence supporting the ALJ's Step Five finding. *Webb v. Comm'r of Soc. Sec*., 368 F.3d 629, 633 (6th Cir. 2004).  The ALJ thus reasonably found Hyson not disabled at Step Five.

## VII.  Conclusion

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff

George G. Hyson's application for Disability Insurance Benefits is AFFIRMED.


Dated: June 5, 2013

_____
Kathleen B. Burke
United States Magistrate Judge